Julianne **EISENBERG**, Plaintiff,

v.

**ADVANCE RELOCATION AND STORAGE, INC., Advance Relocation and Storage of Connecticut, Inc., B. Nilsson Moving and Storage, Inc. and Molloy Bros. Moving and Storage, Inc., Defendants.**

No. 99 Civ. 1474(WCC).

United States District Court, S.D. New York.

Feb. 16, 2000.

---

**242**

Drake, Sommers, Loeb, Tarshis & Catania, P.C., Newburgh, NY (Daniel J. Schneider, of counsel), for plaintiff.

Law Offices of Vincent Toomey, Lake Success, NY (Vincent Toomey, of counsel), for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff, Julianne Eisenberg, brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2, et seq., and the New York State Human Rights Law, New York Executive Law §§ 290, et seq., in which she alleges that she was subjected to a hostile work environment, discriminated against and terminated by defendants on the basis of her sex, and terminated in retaliation for her complaints of sexual harassment. Defendants are Advance Relocation and Storage, Inc., its subsidiary, Advance Relocation and Storage of Connecticut, Inc. ("Advance"), and related companies B. Nilsson Moving and Storage, Inc. and Molloy Bros. Moving and Storage Company. Defendants now move for summary judgment and dismissal of the entire Amended Complaint ("Complaint") on the basis that plaintiff is not entitled to the protections of Title VII or the New York State Human Rights Law ("NYSHRL") because she was not defendants' employee, but was an independent contractor. Further, defendants move for summary judgment on plaintiff's retaliation claims, on the basis that there is no evidence that plaintiff was terminated for discriminatory reasons. For the reasons stated below, defendants' motion for summary judgment is granted.

### BACKGROUND

Plaintiff rendered services for Advance performing truck loading and warehouse

work for a number of weeks during August and September 1998. There is some dispute as to the exact number, but plaintiff worked for Advance between twenty-eight (28) and thirty-five (35) days. Plaintiff began working for Advance after having lunch with a few people who were working for Advance, including Peter White. (Eisenberg Dep. at 47.) Peter White, who went to high school with plaintiff, did all the hiring for Advance at that time, and mentioned that Advance needed help. (*Id.* at 55.) Plaintiff told White that she would be "perfect" for moving and warehouse work because of her strength. (Def. Rule 56.1 Stmt. ¶ 21.)

At that lunch, plaintiff discussed the nature of the position with White. Plaintiff was informed that there was a forty-hour work week, with a typical workday beginning at eight o'clock in the morning and ending at five o'clock in the evening. (*Id.* at 64.) Plaintiff expressed her desire for a permanent position, but not any concern as to whether any benefits, such as medical coverage or vacation time were provided. (*Id.* at 62–64.) White told plaintiff to go down to Advance's warehouse and fill out an application. Plaintiff did so that same day and was hired. (*Id.* at 59.)

Plaintiff was paid only for the hours she worked, at a rate of ten dollars per hour. (Def. Rule 56.1 Stmt. ¶ 8.) Advance tracked the number of hours plaintiff worked through the use of a time card. Plaintiff was paid only after she submitted a time card. (*Id.* at ¶¶ 10–11.) Plaintiff's time cards indicate that she worked less than forty hours each week. (Schneider Aff., Ex. E.) Plaintiff never complained or raised any objections about being given less than forty hours of work per week. (Eisenberg Dep. at 133.)

Plaintiff was not paid for any personal days, sick time, or vacation time.[1] (Def. Rule 56.1 Stmt. ¶ 15.) Plaintiff was also not provided with health insurance or any other benefits. (Eisenberg Dep. at 83–84.)

Plaintiff received no training for her work at Advance. (Def. Rule 56.1 Stmt. ¶ 16.)

Plaintiff was required to pay her own taxes for her wages. No taxes were ever taken out of a paycheck she received from Advance, and she received an IRS form 1099 from Advance for 1998. Plaintiff completed an IRS W–9 form on the first day she provided services for Advance. (*Id.* at ¶ 18.)

At Advance, there was a distinction between "casual labor" and permanent employees. According to Joan Isaacson, the officer manager of Advance's warehouse in Connecticut, only permanent employees received the company manual and casual labor is "someone who gets hired by the day as needed and is ... just paid for the hours that they work without taxes being deducted." (Isaacson Dep. at 43.) Isaacson understood plaintiff to be a casual laborer. (*Id.* at 43–44.) Plaintiff testified that she and other employees that worked on the truck and in the warehouse were permanent. (Eisenberg Dep. at 94–95.) However, plaintiff also testified that the issue of her working for others while she worked for Advance was never discussed. (*Id.* at 85.)

Peter White was plaintiff's supervisor at Advance. White told plaintiff where to report to work and plaintiff "pretty much did whatever Pete White told [her] to do." (*Id.* at 71.)

Plaintiff alleges that during her work at Advance she was "subject to severe sexual harassment in the form of abusive and derogatory remarks and physical touching by the male employees." (Complt.¶ 16.) Plaintiff also alleges that she regularly complained about the harassment to Peter White. (Eisenberg Aff. ¶ 15.)

On September 16, 1998, plaintiff saw other Advance workers using cocaine in the warehouse. She reported this to Isaacson and also complained about the

---

1. Plaintiff alleges that White told her that she would become eligible for benefits after a year of work, but because she only worked a few weeks, this fact was of no consequence.

ongoing sexual harassment. (*Id.* at ¶ 16.) Isaacson testified that September 16, 1998 was the first time she heard plaintiff's complaints of sexual harassment. (Isaacson Dep. at 73.) Upon hearing plaintiff's complaints, Isaacson typed a letter for plaintiff, who dictated what should be included. The letter was dated September 16, 1998.

After plaintiff complained to Isaacson, Isaacson spoke to Pete White and called Daniel McLoughlin, Advance's Director of Operations. (Isaacson Dep. at 52.) Both McLoughlin and Isaacson testified that when Isaacson called McLoughlin on the evening of September 16, 1998, they only discussed the use of drugs in the warehouse, and did not mention Eisenberg's complaints of sexual harassment. (Def. Rule 56.1 Stmt. ¶ 26.)

On September 17, 1998 at approximately seven o'clock in the morning, McLoughlin telephoned Isaacson at her home to inform her he was on his way to close Advance's warehouse and offices in Connecticut. (*Id.* at ¶ 27.) The decision to close the facility was made by McLoughlin and Jim Molloy, the owner of Advance of Connecticut. (*Id.* at ¶ 28.) McLoughlin testified that the sole basis for their decision to close the facility was their knowledge of drug use in the warehouse. (*Id.*) According to McLoughlin, he did not learn of plaintiff's complaints of sexual harassment until he was in the process of closing the warehouse on September 17, 1998. Every person who worked at the Connecticut warehouse and offices, excluding Isaacson, was terminated and was not reassigned to work for Advance at another location. (*Id.* at ¶ 31.) Plaintiff does not dispute McLoughlin's testimony that he did not learn of plaintiff's complaints until after the decision was made to close the warehouse and offices. In fact, plaintiff testified that "... the overall reason that the branch was being shut down wasn't because of the way that people were being treated but was because of the drug use by Pete. I mean, overall, it didn't seem like anything else other than that mattered." (Eisenberg Dep. at 368.)

Instead of arguing that McLoughlin knew of plaintiff's complaints of sexual harassment when he decided to terminate her and all of the other Advance employees at the Connecticut location, plaintiff argues that Isaacson promised her future work with Advance. Although not mentioned in plaintiff's Amended Complaint,[2] plaintiff states in her affidavit that on September 17, 1998, Isaacson told her that the closure of the Connecticut facility would be temporary. (Eisenberg Aff. ¶ 17.) Plaintiff also states that Isaacson told her that she was a valuable asset and that she should not take any other position because Isaacson wanted her to return to work at Advance when the Connecticut facility reopened. (*Id.* at ¶ 18.) Isaacson also allegedly asked whether plaintiff would be willing to relocate, to which plaintiff responded that she would relocate if she did not have to work with the same men. (*Id.* at 19–20.)

Plaintiff also states that during their discussion plaintiff told Isaacson that she was thinking of seeking legal counsel because of the sexual harassment which she suffered at Advance. (*Id.* at ¶ 21.) Plaintiff alleges that Isaacson said that she would not be able to secure another position for plaintiff with Advance if plaintiff filed a complaint or sought legal counsel. (*Id.* at ¶ 22.) Isaacson then gave her a business card and wrote her home telephone number on it, indicating that plaintiff should stay in touch. (*Id.* at ¶ 24; Schneider Aff., Ex. 4 (copy of Isaacson's business card with home telephone number written on it).) Plaintiff was never contacted by anyone at Advance to return

---

**2.** Defendants also argue that plaintiff failed to furnish any information on this claim during discovery, despite the fact that Defendants' Interrogatory No. 10 specifically asked plaintiff for any witnesses or documents supporting her retaliation claim. (Def. Reply Memo. at 9.)

to work. Isaacson stated in her affirmation that on September 17, 1998, she gave her business card and home number to many employees at Advance, including plaintiff, so that these people could provide her name and number as a reference for their future employers. (Isaacson Aff. at ¶ 2.)

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(d). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the non-moving party. *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### II. *Title VII and Employment Status*

 Title VII provides that it shall be unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment on the basis of, inter alia, the individual's gender. 42 U.S.C. § 2000(e)–2(1). Title VII protects only "employees"; independent contractors may not obtain relief under the statute. *Stetka v. Hunt Real Estate Corp.,* 859 F.Supp. 661, 665 (W.D.N.Y.1994); *Krijn v. Pogue Simone Real Estate Co.,* 752 F.Supp. 102, 104 (S.D.N.Y.1990), *aff'd mem.,* 930 F.2d 910 (1991).

The United States Supreme Court has held that "where a statute containing the term 'employee' does not helpfully define it, the common law agency test should be applied." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322–23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *see also O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir.1997). Because Title VII contains only a circular definition of "employee," *see O'Connor,* 126 F.3d at 115, we look to common law agency principles to determine whether plaintiff was an employee or an independent contractor. *See Tagare v. Nynex Network Systems Co.,* 994 F.Supp. 149, 154 (S.D.N.Y.1997) (Conner, Senior J.).

In *Community for Creative Non–Violence v. Reid,* the Supreme Court set out the following factors relevant to this inquiry:

1. the tax treatment of the hired party;

2. the skill required;

3. the provision of employee benefits;

4. the hiring party's right to control the manner and means by which the product is accomplished;

5. whether the hiring party has the right to assign additional projects to the hired party;

6. the source of the instrumentalities and tools;

7. the location of the work;

8. the duration of the relationship between the parties;

9. the extent of the hired party's discretion over when and how long to work;

10. the method of payment;

11. the hired party's role in hiring and paying assistants;

12. whether the work is a part of the regular business of the hiring party; and

13. whether the hiring party is a business.

490 U.S. 730, 751–52 (1989); *Tagare*, 994 F.Supp. at 154. No one of these factors is determinative. *Reid*, 490 U.S. at 752, 109 S.Ct. 2166.

Recognizing that not all factors are equally important or have relevance in every case, the Second Circuit has adopted a weighted approach in applying the *Reid* test. *See Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir.1992). In *Aymes*, the court identified the first five factors, the tax treatment of the hired party, the skill required by the position, the provision of employee benefits, the hiring party's right to control the manner and means by which the product is accomplished, and whether the hiring party has the right to assign additional projects, as factors that will be significant in every situation. *See id.*

■ The determination of whether a plaintiff is an employee or an independent contractor is a question of law, while the existence and degree of the factors to be considered in this determination are questions of fact. *See Stetka*, 859 F.Supp. at 665. Therefore, it is appropriate for this Court to decide whether plaintiff is an employee or an independent contractor on a motion for summary judgment.

### A. *Application of the Reid Factors*

#### 1. *Tax Treatment*

■ The parties' tax treatment of the employment relationship is highly indicative, and may even constitute a "virtual admission" of the hired party's status. *Aymes*, 980 F.2d at 862. Here, defendants did not deduct or withhold any income, social security, payroll or other taxes from plaintiff's wages. Plaintiff was required to pay her own taxes on her wages. No taxes were ever taken out of a paycheck she received from Advance, and she received an IRS form 1099 (for non-employee compensation) from Advance for 1998. Plaintiff completed an IRS W–9 form on the first day she provided services for Advance.

This tax treatment strongly indicates that plaintiff was an independent contractor. In *Tagare*, this Court attached great significance to the fact that the parties both portrayed the hired party as an independent contractor by their tax treatment. 994 F.Supp. at 155. Significantly, at the time of the *Aymes* decision, every case that had applied the *Reid* test found the hired party to be an independent contractor where the hiring party failed to [extend benefits] or pay social security taxes. *See Aymes*, 980 F.2d at 863, *citing MacLean Assocs. v. WM. M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 777 (3d Cir. 1991); *Marco v. Accent Publishing Co.*, 969 F.2d 1547, 1550 (3d Cir.1992); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1492 (11th Cir.1990); *Johannsen v. Brown*, 797 F.Supp. 835, 841 (D.Or. 1992); *Kunycia v. Melville Realty Co.*, 755 F.Supp. 566, 575 (S.D.N.Y.1990); *Kelstall–Whitney v. Mahar*, No. 89 Civ. 4684, 1990 WL 69013 (E.D.Pa. May 23, 1990); *see also Keller v. Niskayuna Consol. Fire District 1*, 51 F.Supp.2d 223, 228 (N.D.N.Y. 1999) (finding hired parties to be independent contractors where IRS forms issued for compensation were forms that provided for "miscellaneous income," not wages);

*Stetka,* 859 F.Supp. at 667 (finding real estate agent to be an independent contractor where no taxes were deducted from the plaintiff's gross commission payment and the plaintiff received a Form 1099); *Frishberg v. Esprit de Corp.,* 778 F.Supp. 793, 798 (S.D.N.Y.1991) (finding salesman to be an independent contractor where hiring party did not withhold payroll taxes), *aff'd without opinion,* 969 F.2d 1042 (2d Cir. 1992); *Krijn,* 752 F.Supp. at 104 (finding real estate agent to be an independent contractor where agency did not withhold taxes).

However, in *McFadden–Peel v. Staten Island Cable,* 873 F.Supp. 757, 761 (E.D.N.Y.1994), the court found that the "quality of [the] plaintiff's responsibilities to be the deciding factor." Thus, despite the fact that no taxes were withheld from the hired party's paychecks, the court found that she was an employee. *See id.*

Therefore, although the tax treatment of plaintiff, including defendants' failure to withhold any taxes and plaintiff's completion of the W–9 and 1099 Forms, strongly indicates that plaintiff was an independent contractor, this factor alone cannot be determinative.

### 2. *Skill Required*

Plaintiff's responsibilities included loading and unloading trucks or other work in Advance's warehouse. Defendants' argue that because the position requires strength and agility and plaintiff was hired for her strength, she possesses specialized skills such that she should be considered an independent contractor.

In *Aymes,* the court found that the hired party's ability as a computer programmer required that he use skills developed as a graduate student and in previous work, and these skills strongly indicated that he was an independent contractor. 980 F.2d at 862. Similarly in *Tagare,* it was undisputed that the plaintiff was hired for his specialized skills as a consultant on the Fiberoptic Link Around the Globe project, and this fact weighed in favor of indepen-

dent contractor status. 994 F.Supp. at 157. In *Keller,* the court found the treasurer of the Fire District to be a position requiring a fairly high level of skills because she was responsible for paying all of the financial obligations of the Fire District and handling payroll. 51 F.Supp.2d at 228. "Other courts that have addressed the level of skill necessary to indicate that a party is an independent contractor have held architects, photographers, graphic artists, drafters, and computer programmers to be highly-skilled independent contractors." *Aymes,* 980 F.2d at 862 (citations omitted).

Although plaintiff was hired for her strength, and this strength was important in performing her work at Advance, the skills required to work on the truck and in the warehouse of a moving and storage company are not the equivalent of the specialized skills required to work as a computer programmer, photographer, treasurer, graphic artist or drafter. It is significant that plaintiff did not use any skills developed during graduate school, in special training, or through extensive prior experience, to perform her work at Advance. This factor weighs in favor of employee status for plaintiff.

### 3. *Provision of Employee Benefits*

It is undisputed that plaintiff was not entitled to, and did not receive, any employee benefits from Advance. She did not have any vacation or sick days. She did not receive health care insurance or any pension or disability benefits. Again, in *Aymes* the Court noted that every case that had applied the *Reid* test (up until the time of the *Aymes* decision) had found the hired party to be an independent contractor where the hiring party failed to extend benefits [or pay social security taxes]. *See Aymes,* 980 F.2d at 863 (citations omitted). In *Tagare,* the fact that the plaintiff did not receive any regular employee benefits was "highly probative" of his status as an independent contractor. 994 F.Supp. at

156; *see also Frishberg*, 778 F.Supp. at 799 (finding the fact that Frishberg paid for his own pension and health benefits indicative of his independent contractor status). *But see McFadden–Peel*, 873 F.Supp. at 761 (finding the hired party to be an employee despite the fact that she did not participate in employee pension or health insurance plans). Therefore, plaintiff's lack of regular employee benefits from Advance is strong indicator that she was an independent contractor, but must be considered along with the other *Reid* factors.

### 4. *Control of Manner and Means*

Defendants exercised significant control over the manner and means by which plaintiff did her work at Advance. Peter White directed when and where plaintiff should report to work. Plaintiff testified that she "pretty much did whatever Pete White told [her] to do." (Eisenberg Dep. at 71.) Although "a supervisory relationship is not necessarily inconsistent with independent contractor status," the Supreme Court and most courts within the Second Circuit emphasize the "extent of the hiring party's control over the hired party's daily activities." *Tagare*, 994 F.Supp. at 156, *citing Reid*, 490 U.S. at 752, 109 S.Ct. 2166 (hired party was independent contractor where "daily supervision of his activities [was] practically impossible"); *Stetka*, 859 F.Supp. at 667 (hired party was independent contractor where hiring party "did not exercise day-to-day control over [hired party] such as an employer would exercise over an employee"); *Krijn*, 752 F.Supp. at 104 (hired party was independent contractor where her "supervisor" did not exercise any meaningful control over [her] hours or over the day-to-day details of her work). Because Peter White exercised nearly complete control over plaintiff's hours and the day-to-day details of her work, this factor weighs heavily in favor of employee status for plaintiff.

### 5. *The Right to Assign Other Projects*

Defendants assert that there is a lack of evidence on this factor. Upon review of the evidence presented, it is evident that this factor should not carry much significance in this case. Plaintiff was hired to work as a mover on Advance's trucks and in its warehouse. She was not hired for a specific move or project. Thus, although defendants assigned plaintiff to numerous moves or projects, that did not change the essential character of the job, which was to perform work on Advance's trucks and in its warehouse, on whatever moves or projects Advance undertook while she was there. Therefore, this factor weighs slightly in favor of employee status.

### 6. *Source of Instrumentalities*

Advance supplied all of the instrumentalities necessary to complete plaintiff's work. Plaintiff did not have the right to hire any assistants, did not lay out any of her own money for work, and used Advance's trucks and other supplies. In contrast, where the hired party furnished his own place of work and hired assistants, the court found him to be an independent contractor. *See Frishberg*, 778 F.Supp. at 799. However, the court in *Aymes* found the fact that the hired party used the hiring party's equipment of little weight in the analysis because "the programming by necessity had to be performed on [the hiring party's] machines." 980 F.2d at 864. Here, it was by some necessity that plaintiff used defendants' equipment: plaintiff was hired to move boxes and other cargo on and off of Advance trucks and in and out of the Advance warehouse. Therefore, although this factor weighs in favor of employee status, it is of little significance in this case.

### 7. *Location of the Work*

The majority of plaintiff's work took place at Advance's warehouse or on Advance's trucks. Although this would typically weigh in favor of employee status,

because it was by necessity that plaintiff's work was at defendants' place of business, this factor does not carry much weight. *See id.*

### 8. *Duration of the Parties' Relationship*

Although there is some dispute as to the exact number of days, plaintiff worked for Advance for anywhere between twenty-eight (28) and thirty-five (35) days. Generally, a short duration of the parties' relationship would indicate that the hired party was a independent contractor. *Cf. id.* (stating that Frishberg's selling Esprit products for a long period of time supports his status as an employee, but finding that he was an independent contractor based on other factors). However, because plaintiff stopped working for Advance only because the entire warehouse was closed and every worker (with the exception of Isaacson) was terminated, this factor is of little significance.

### 9. *Plaintiff's Discretion Over When and How Long to Work*

Plaintiff was directed by Peter White as to when and how long to work. However, plaintiff testified that if no moves or other work was scheduled, she could take time off. (Pl. Rule 56.1 Stmt. ¶ 47.) Also significant is the fact that plaintiff was paid only for the hours that she worked. Because plaintiff had some control over her schedule, this factor weighs only slightly in favor of employee status.

### 10. *Method of Payment*

As noted above, plaintiff was paid by the hour, and only for the hours that she worked. Plaintiff states that she was guaranteed forty hours of work per week, but her time· cards indicate that she worked less than forty hours during several weeks and never objected. In *Keller,* the court indicated that monthly payment was more consistent with the payment of a regular employee. 51 F.Supp.2d at 229. Although plaintiff was not paid a regular

monthly salary and her payment varied with her hours, she was not paid on a commission basis, which would be indicative of independent contractor status. *See, e.g., Frishberg,* 778 F.Supp. at 799 (finding hired party to be an independent contractor when paid only by commission); *Krijn,* 752 F.Supp. at 104 (finding hired party to be an independent contractor when paid only by commission). However, on balance, plaintiff's hourly wage weighs in favor of independent contractor status, especially because plaintiff was not guaranteed a specified number of hours each week.

### 11. *Plaintiff's Role in Hiring Assistants*

As discussed above, plaintiff did not have the ability to hire assistants. However, because defendants did not hire assistants for her, this factor is not significant in this case.

### 12. *Whether Plaintiff's Work was in the Regular Business of Advance*

The purpose of this factor is "to determine whether the hired party is performing tasks that directly relate to the objective of the hiring party's business." *Aymes,* 980 F.2d at 863. Advance is in the business of moving and storage. Plaintiff's work in the warehouse and on moving trucks is obviously in the regular business of Advance. However, "this factor will generally be of little use" and is not a strong indicator of employee or independent contractor status. *Id.*

### 13. *Whether Defendants are in Business*

Obviously, Advance is a business. Again, this factor has very little weight in the analysis. *See id.*

### B. *Conclusion Based on Reid Factors*

Upon consideration of all of the *Reid* factors, it is evident that this is a difficult case. Plaintiff's tax treatment and lack of employee benefits weigh heavily in favor of

independent contractor status. This Court also notes that the Second Circuit has relied heavily on these two factors in the *Reid* analysis. *See id.* at 863 (citations omitted). The fact that plaintiff was only paid for the hours that she worked and did not object to working less than forty hours a week also weighs in favor of independent contractor status.

However, other important factors weigh in favor of employee status. Plaintiff's position was unskilled work. Advance had complete control over the manner and means of plaintiff's work. Plaintiff also had little discretion when and how long to work: Peter White directed plaintiff when to arrive at work and when she could leave.

Also significant is the fact that plaintiff's warehouse and truck work was central to Advance's functioning. Plaintiff was not hired for one large project at Advance; plaintiff was hired to do the daily work that is Advance's business. In *McFadden–Peel*, the court found the hired party to be an employee despite the fact that her tax treatment, lack of benefits, and payment by project instead of salary, indicated independent contractor status, because her duties as Director of Administration and Marketing were central to the hiring party's functioning and "were not of a kind normally turned over to an independent contractor." 873 F.Supp. at 761–62. Although plaintiff's work was central to Advance's functioning as a moving and storage company, plaintiff did not have a leadership position at Advance like the hired party did in *McFadden–Peel*.

Considering all these factors, although it is a close call, the Court finds that plaintiff was an independent contractor and not an employee of Advance. Therefore, plaintiff is not entitled to the protections of Title VII and summary judgment is granted with respect to plaintiff's Title VII claims.

### III. *New York State Human Rights Law and Employment Status*

 The protections of NYSHRL, like Title VII, apply solely to employees and not independent contractors. *See Tagare,* 994 F.Supp. at 159 (citing *Scott v. Massachusetts Mut. Life Ins. Co.,* 86 N.Y.2d 429, 633 N.Y.S.2d 754, 756, 657 N.E.2d 769 (Ct.App.1995)). The factors considered in determination of employment status under NYSHRL "largely mirror those weighed in Title VII claims." *Id.* Therefore, for the same reasons discussed above, plaintiff is not entitled to the protections of NYSHRL and summary judgment is granted with respect to plaintiff's NYSHRL claims.

### CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. The Clerk of the Court shall enter judgment for defendants.

SO ORDERED.